Stater Bros., Inc. - Second Street, et al. [1] v. Commissioner. Stater Bros., Inc. v. Commissioner
Docket Nos. 78922-78936, 82533-82553, 86843-86859, 86888-86892.
United States Tax Court
T.C. Memo 1962-147; 1962 Tax Ct. Memo LEXIS 162; 21 T.C.M. (CCH) 780; T.C.M. (RIA) 62147; June 20, 1962
*162 John G. Gemmill, Esq., and Robert L. Farmer, Esq., 900 Wilshire Blvd., Los Angeles, Calif., for the petitioners. J. Q. Smith, Esq., and David R. Brennan, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in the income tax of the petitioners as follows: Petitioner
Docket No.
Year ended
Deficiency
Stater Bros., Inc. - Second Street
78922
10/31/53
$ 5,107.14
10/31/54
5,107.14
82544
10/31/55
5,156.25
10/31/56
5,176.48
10/31/57
5,210.53
86889
10/31/58
5,210.53
Stater Bros., Inc. - Hemet
78925
10/31/54
1,821.60
82548
10/31/55
5,131.69
10/31/56
4,918.06
10/31/57
5,210.53
86856
10/31/58
5,210.53
Stater Bros., Inc. - Arlington
78927
10/31/54
5,308.51
82534
10/31/55
5,156.25
10/31/56
5,176.48
10/31/57
5,210.53
86851
10/31/58
5,210.53
Stater Bros., Inc. - East Riverside
78935
10/31/53
5,107.14
10/31/54
5,107.14
82535
10/31/55
5,156.25
10/31/56
5,176.48
10/31/57
5,210.53
86843
10/31/58
5,210.53
Stater Bros. Markets (Successor to Stater Bros., Inc. - Redlands)
78926
10/31/53
5,107.14
10/31/54
5,107.14
Stater Bros. Markets (Formerly Stater Bros., Inc. - Redlands)
82538
10/31/55
5,156.25
10/31/56
4,998.20
10/31/57
4,213.56
86844
11/1/57 - 4/3/58
2,411.76
Stater Bros. Markets (Successor to Stater Bros., Inc. - Highland)
78928
10/31/53
5,107.14
10/31/54
5,107.14
Stater Bros. Markets (Formerly Stater Bros., Inc. - Highland)
82552
10/31/55
5,156.25
10/31/56
5,176.48
10/31/57
5,210.53
86892
11/1/57 - 4/3/58
4,632.40
Stater Bros. Markets (Successor to Stater Bros., Inc. - West
Riverside)
78929
10/31/53
5,107.14
10/31/54
5,107.14
Stater Bros. Markets (Formerly Stater Bros., Inc. - West
Riverside)
82545
10/31/55
5,156.25
10/31/56
5,176.48
10/31/57
5,210.53
86859
11/1/57 - 4/3/58
5,210.53
Stater Bros. Markets (Successor to Stater Bros., Inc. - Colton)
78930
10/31/53
4,846.58
10/31/54
4,667.07
Stater Bros. Markets (Formerly Stater Bros., Inc. - Colton)
82550
10/31/55
3,004.75
10/31/56
5,032.28
10/31/57
5,210.53
86888
11/1/57 - 4/3/58
5,210.53
Stater Bros. Markets (Successor to Stater Bros., Inc. - Magnolia)
78931
10/31/53
5,107.14
10/31/54
5,107.14
Stater Bros. Markets (Formerly Stater Bros., Inc. - Magnolia)
82541
10/31/55
$5,156.25
10/31/56
5,176.48
10/31/57
5,210.53
86848
11/1/57 - 4/3/58
5,210.53
Stater Bros. Markets (Successor to Stater Bros., Inc. - Pomona)
78933
10/31/53
5,107.14
10/31/54
5,107.14
Stater Bros. Markets (Formerly Stater Bros., Inc. - Pomona)
82540
10/31/55
5,156.25
10/31/56
3,369.33
10/31/57
5,210.53
86858
11/1/57 - 4/3/58
5,210.53
Stater Bros. Markets (Successor to Stater Bros., Inc. - Base Line)
78934
10/31/53
5,107.14
10/31/54
5,107.14
Stater Bros. Markets (Formerly Stater Bros., Inc. - Base Line)
82536
10/31/55
5,156.24
10/31/56
5,176.48
10/31/57
5,210.53
86890
11/1/57 - 4/3/58
5,210.53
Stater Bros. Markets (Successor to Stater Bros., Inc. - Fontana)
78936
10/31/53
5,107.14
10/31/54
5,107.14
Stater Bros. Markets (Formerly Stater Bros., Inc. - Fontana)
82539
10/31/55
5,156.25
10/31/56
5,176.48
10/31/57
3,839.68
86854
11/1/57 - 4/3/58
3,902.53
Stater Bros. Markets (Successor to Stater Bros., Inc. - Glendora)
82537
10/31/55
5,156.25
10/31/56
5,176.48
10/31/57
5,210.53
Stater Bros. Markets (Formerly Stater Bros., Inc. - Glendora)
86850
10/31/58
5,210.53
Stater Bros. Markets (Formerly Stater Bros., Inc. - North
Pomona)
82542
8/31/57
5,210.53
86857
9/1/57 - 4/3/58
5,210.53
Stater Bros. Markets (Formerly Stater Bros., Inc. - South
Fontana)
82546
10/31/55
5,035.73
10/31/56
5,176.48
10/31/57
5,210.53
86891
11/1/57 - 4/3/58
5,210.53
Stater Bros. Markets (Formerly Stater Bros., Inc. - North
Redlands)
82549
12/19/55 - 10/31/56
2,021.80
10/31/57
5,210.53
86853
11/1/57 - 4/3/58
5,210.53
Stater Bros. Markets (Formerly Stater Bros., Inc. - Whittier)
82551
10/31/55
5,156.25
10/31/56
4,280.24
10/31/57
3,679.49
86855
11/1/57 - 4/3/58
3,929.24
Stater Bros. Markets (Formerly Stater Bros., Inc. - Rialto)
82553
10/31/56
5,176.48
10/31/57
5,210.53
86845
11/1/57 - 4/3/58
5,210.53
Stater Bros. Markets (Formerly Stater Bros., Inc. - Ontario)
86849
9/1/57 - 4/3/58
4,223.97
Leo A. Stater and Mary E. Stater
78924
12/31/53
139,865.50
12/31/54
177,202.14
82547
12/31/55
188,876.76
12/31/56
217,379.10
12/31/57
262,932.67
86847
12/31/58
236,900.74
Cleo M. Stater and Elsie R. Stater
78932
12/31/53
139,834.76
12/31/54
177,342.67
82543
12/31/55
189,082.80
12/31/56
217,558.10
12/31/57
262,994.54
86846
12/31/58
237,002.08
Stater Bros. (a partnership);
Stater Bros., Inc. - West Riverside;
Stater Bros., Inc. - Second Street;
Stater Bros., Inc. - Redlands;
Stater Bros., Inc. - Pomona;
Stater Bros., Inc. - Magnolia;
Stater Bros., Inc. - Highland;
Stater Bros., Inc. - Fontana;
78923
12/31/53
204,124.86
Stater Bros., Inc. - East Riverside
12/31/54
237,184.42
Stater Bros., Inc. - Colton;
Stater Bros., Inc. - Base Line;
Stater Bros., Inc. - Hemet;
Stater Bros., Inc. - Arlington;
Stater Bros., Inc. - Glendora;
Stater Bros., Inc. - Whittier;
an association taxable as a corporation
Stater Bros., Inc. - Base Line;
Stater Bros., Inc. - Highland;
Stater Bros., Inc. - Fontana;
Stater Bros., Inc. - Magnolia;
Stater Bros., Inc. - West Riverside;
Stater Bros., Inc. - Second Street;
Stater Bros., Inc. - East Riverside;
Stater Bros., Inc. - Redlands;
Stater Bros., Inc. - Pomona;
Stater Bros., Inc. - Colton;
82533
12/31/55
$286,515.95
Stater Bros., Inc. - Hemet;
12/31/56
316,253.23
Stater Bros., Inc. - Arlington;
12/31/57
358,305.61
Stater Bros., Inc. - Glendora;
86852
12/31/58
347,353.28
Stater Bros., Inc. - Whittier;
Stater Bros., Inc. - Rialto;
Stater Bros., Inc. - North Redlands;
Stater Bros., Inc. - South Fontana;
Stater Bros., Inc. - North Pomona;
Stater Bros., Inc. - Ontario; and
Stater Brothers (a partnership),
an association taxable as a corporation
*163 Issues presented by the pleadings are the correctness of the respondent's action in determining (1) that the income reported by the petitioner corporations for their respective taxable years as having been derived from joint ventures with retail food market managers was includible in the income of Stater Brothers Partnership in which petitioners Cleo M. Stater and Leo A. Stater were equal partners, (2) that the respective petitioner corporations for their respective taxable years were entitled only to a fraction of one surtax exemption and, for the applicable years, only to a like fraction of one minimum excess profits credit and that in the aggregate all of the petitioner corporations were entitled to only one such exemption and for applicable years one such credit, and (3) that the petitioner corporations together with Stater Brothers Partnership constituted an association taxable as a corporation for the calendar years in which the fiscal years of the corporations ended. The respondent made the foregoing contested determinations in the alternative and on brief concedes error as to the determination involved in issue (3). As a consequence, only issues (1) and (2) remain for determination. *164 Findings of Fact Some of the facts have been stipulated and are found accordingly. The Federal income tax returns of the corporate petitioners herein for the taxable years with respect to which the respondent has made determinations of deficiencies in their income tax liability were filed with the director in Los Angeles, California. Petitioners Leo A. Stater and Mary E. Stater are husband and wife with residence in Corona del Mar, California. They filed their Federal joint income tax returns for the years 1953 through 1958 with the director in Los Angeles, California. Petitioners Cleo M. Stater and Elsie R. Stater are husband and wife with residence in San Bernardino, California. They filed their Federal joint income tax returns for the years 1953 through 1958 with the director in Los Angeles, California. On or about October 1, 1936, Cleo M. Stater and Leo A. Stater, who are brothers, orally joined together as equal partners for the purpose of operating a retail food market in Yucaipa, California, under the name of "Stater Bros." About January 1, 1938, the partnership acquired a second retail food market which was situated in Colton, California, and Lavoy R. Stater, a brother *165 of Cleo and Leo, orally joined the partnership as an equal partner. Near the end of 1938 he withdrew and Cleo and Leo as equal partners in a partnership, sometimes hereinafter referred to as Stater Brothers Partnership, continued the operation of the two markets. Cleo and Leo each joined the enlisted reserve corps of the United States Army in 1942 and were assigned to inactive duty. At the time of their enlistment, Stater Brothers Partnership owned four retail food markets as follows: Bloomington, Bloomington, California, Fontana, Fontana, California, Colton, Colton, California, and East Riverside, Riverside, California. Shortly after enlistment Cleo, who had had extensive civilian pilot experience, was assigned to Phoenix, Arizona, in a civilian status as an instructor of Army pilots subject to call to active duty to perform the same service. Leo had had similar pilot experience and 6 months later was placed under a similar assignment at Hemet, California, where he continued to be stationed in such status throughout the remainder of World War II. About 1944 Cleo was commissioned as a pilot, was assigned to extensive duty overseas, and did not return to California until the war *166 ended in 1945. Leo continued supervision of the four markets during his off-duty time. Wartime food and labor shortages imposed increasingly difficult situations on the operation of the markets. Leo caused Stater Brothers Partnership to purchase a meat packing house in Temecula, California, to alleviate a meat shortage and supervised its operations in addition to supervising the operations of the markets. The partnership had only one administrative office employee, Bessie Leora Smith. Conditions at the East Riverside market so deteriorated that Leo discharged the manager and the butcher and closed that market. Subsequently he induced his father, Clarence M. Stater, who had no previous experience in the food market business, to reopen and operate the East Riverside market. The Bloomington market experienced similar difficulties and Mary E. Stater, mother of Cleo and Leo, who also had no previous experience in the food market business, became the manager of the Bloomington market. As of January 1, 1944, Shelby Robbins was brought into the organization to act as office manager of Stater Brothers Partnership. Robbins and Paul Woodstra, who had been manager of the Colton market since *167 August 1939, each invested $5,000, and, under a written agreement of limited partnership, became limited partners of Stater Brothers Partnership. Each of the limited partners, Robbins and Woodstra, was entitled to a salary and a percentage of the profits based on the proportion of his investment to the total capital of the partnership. Robbins left the organization on or about September 1, 1944, but continued to share in profits and losses through December 1944. Paul Woodstra withdrew from the limited partnership on September 1, 1944, but continued after that date to assist Leo in the general supervision of all the retail markets. A partnership return of income under the name of Stater Brothers was filed for the limited partnership for the period January 1, 1944, through August 31, 1944, in which Cleo, Leo, Shelby Robbins, and Paul Woodstra were shown as the persons participating in the profits. A partnership return of income under the name of Stater Brothers was filed for the limited partnership for the period September 1, 1944, through December 31, 1944, in which Cleo, Leo, and Robbins were shown as the persons participating in the profits and losses. An oral partnership agreement *168 for the operation of the East Riverside market commencing August 15, 1944, was entered into by Stater Brothers Partnership with Clarence M. Stater. Under the agreement the latter was made manager and was entitled to a salary and to 50 percent of the profits resulting from the operation of the market. He made no contribution of capital but he agreed to limit his withdrawals to his salary and to sufficient of his share of the profits to pay the income taxes thereon until his accumulated capital equaled 50 percent of the total partnership capital. As of August 1, 1946, he withdrew from the East Riverside partnership and was paid the book value of his capital account in that market. Alfred Clark became manager of the East Riverside market as of September 1, 1946, pursuant to an oral partnership agreement between him and Stater Brothers Partnership consisting of substantially the same terms as the agreement that previously existed between Clarence M. Stater and the partnership respecting the operation of the market. Partnership returns of income under the name of Stater Brothers reflecting the operation of the East Riverside market were filed as follows: for the period August 15, 1944, through *169 December 31, 1944, for the year 1945, and for the period January 1, 1946, through July 31, 1946, in which Clarence M. Stater, Cleo, and Leo were shown as the persons participating in the profits, and for the period August 1, 1946, through December 31, 1946, in which Alfred Clark, Cleo, and Leo were shown as the persons participating in the profits. An oral partnership agreement for the operation of the Fontana market commencing September 1, 1944, was entered into by Stater Brothers Partnership and Paul Woodstra. Under the agreement Woodstra was manager and was entitled to a salary and to 50 percent of the profits resulting from the operation of the market. He agreed to limit his withdrawals to his salary and sufficient of his share of the profits to pay the income tax thereon until his accumulated capital equaled 50 percent of the total partnership capital. Partnership returns of income under the name of Stater Brothers reflecting the operations of the Fontana market were filed for the period September 1, 1944, through December 31, 1944, in which Woodstra, Cleo, Leo, and Shelby Robbins were shown as the persons participating in the profits and for 1945 and 1946 in which Woodstra, *170 Cleo, and Leo were shown as the persons participating in the profits. During 1945 Stater Brothers Partnership closed the Bloomington market as a retail outlet. However, the partnership continued to conduct at that location its wholesale functions and administrative services common to all markets. Such activities and the segment of the partnership engaged in the conduct thereof sometimes hereinafter will be referred to as the wholesale division of the partnership. Thereafter separate partnership returns of income were filed under the name of State Brothers showing the Bloomington, California, address, reflecting the operations of the wholesale division and listing Cleo and Leo as the persons participating in the profits. About October 1, 1945, Stater Brothers Partnership opened a retail food market in Rialto, California, and under an oral partnership agreement between the partnership and John Conn, the latter was made manager. Under the agreement Conn was entitled to a salary and to 50 percent of the profits with provisions respecting withdrawals substantially the same as in the agreements with Clarence M. Stater and Paul Woodstra described above. Partnership returns of income under *171 the name of Stater Brothers reflecting the operations of the Rialto market were filed for the period October 1, 1945, through December 31, 1945, and for 1946 in which Conn and Cleo and Leo were shown as the persons participating in the profits. On or about April 12, 1946, Stater Brothers Partnership opened a retail food market in Cedar Glen, California, and Mary E. Stater became manager of the market. A partnership return of income under the name of Stater Brothers reflecting the operations of that market was filed for the period April 12, 1946, through December 31, 1946, in which Cleo and Leo were shown as the persons participating in the profits. Stater Brothers partnership opened a new market in Yucaipa, California, on or about November 1, 1946. Lavoy R. Stater, who had been in the military service during World War II, had undertaken to construct and equip a Stater Brothers market in Yucaipa and, upon its completion in November 1946, became its manager pursuant to an oral partnership agreement between him and Stater Brothers Partnership, the provisions of which were substantially the same as in the agreements with Clarence M. Stater and Paul Woodstra described above. A partnership *172 return of income under the name of Stater Brothers reflecting the operations of that market was filed for the period November 1, 1946, through December 31, 1946, in which Lavoy, Cleo, and Leo were shown as the persons participating in the profits. The operations of retail markets in Colton and Bloomington for 1945 and 1946 were reflected in the partnership returns of income filed for the Fontana market for 1945 and 1946 in which Paul Woodstra, Cleo, and Leo were shown as the persons participating in the profits. During 1947 through 1951 Stater Brothers Partnership opened additional retail markets and closed or sold to outsiders several markets. In cases where markets were opened the partnership entered into oral partnership agreements with the managers similar to those in the cases of Clarence M. Stater and Paul Woodstra described above. A variety store business also was established during this period and subsequently sold. The variety store was conducted under an oral agreement with its manager of the same type used in connection with the food markets. During this period several of the managers, who had established their ability to operate food markets successfully, withdrew from *173 their existing partnership agreements and entered into new partnership agreements with respect to new markets that were opening. Several managers were unsatisfactory and were forced to withdraw. Some managers managed more than one market and a maximum of three markets was reached in the case of Paul Woodstra. Partnership returns of income under the name of Stater Brothers reflecting the operations of the respective markets and the wholesale division continued to be filed for the years 1947 through 1952. Separate partnership returns of income were filed for each market operated without a partnermanager, as well as a separate partnership return of income for the wholesale division, the operations of which, about 1951, were moved from Bloomington, California, to Colton, California. In the partnership returns of income filed for the years 1947 through 1951 reflecting the operations of markets operated by partner-managers, the managers and Cleo and Leo were shown as the persons participating in the profits whereas in such returns filed for 1952 the market managers and "Stater Brothers (Partnership)" were shown as the parties participating in the profits. In the partnership return of income *174 under the name of Stater Brothers reflecting the operations of the wholesale division filed for 1952, there was reported the income of Stater Brothers Partnership from that division and in addition there was reported as income from other partnerships, Stater Brothers Partnership's share of the profits of the following markets of which the indicated persons were partner-managers: Market
Partner-manager
Fontana, Base Line, and
Highland
Paul Woodstra
West Riverside and Mag-
nolia
Lavoy Stater
East Riverside and Sec-
ond Street
Alfred Clark
Colton
Raymond Woodstra
Pomona
Joe S. Burkle
Redlands
Howard Woodstra
Rialto
J. D. Huffaker
In the conduct of the various retail markets Cleo and Leo determined the over-all policy matters relating thereto. The operating details of the markets, including the employment and discharge of personnel, determination of merchandise to be purchased, the pricing thereof, advertising, etc., were handled by the respective managers thereof. In addition to operating the various retail markets Stater Brothers Partnership maintained a central office where the office of the wholesale division of the partnership was maintained. At *175 this office the wholesale division had the physical custody of all books and records for all of the markets, including bank accounts and checkbooks, and handled all of the accounting for the various markets. The markets kept only basic fiscal data which were later submitted to the wholesale division for the centralized accounting. Separate financial books and record [s] were maintained for each market and if a partner-manager managed more than one market, financial books and records were maintained for each market separately. All checks were prepared by the wholesale division. The market managers periodically visited the division's office to discuss their operations with Cleo and Leo and to sign checks, if authorized. At such times the market managers reviewed the cash and other records relating to the markets of which they were managers. As a matter of practice Cleo signed most of the checks. A charge for the administrative services performed by it was made by the wholesale division to the various retail markets. Through its wholesale division Stater Brothers Partnership conducted a wholesale business for the purpose of supplying its retail food markets. While in earlier years *176 Stater Brothers Partnership through its wholesale division handled the bulk of the meats, vegetables, and produce and a small portion of the general grocery items sold by the various retail markets, by 1952 the division had been expanded so as also to handle a larger portion of the general grocery items sold by the markets. Even though under the foregoing arrangement Stater Brothers Partnership made a profit on the meats, vegetables, produce, and groceries which it bought and sold to the individual retail markets, it was more economical for the latter to acquire such items from the partnership than to purchase them from an outside wholesaler. At all times material herein the fronts of all markets were identified as "Stater Bros. Markets" or just "Stater Bros." The trucks, including delivery trucks and delivery equipment, bore "Stater Bros. Markets" as their sign of identification, and the letterheads were identified as "Stater Bros. Markets, General Offices." Cleo and Leo selected the sites for the retail markets. Such markets were operated on premises leased from unrelated third parties and all leases were entered into by Cleo and Leo as lessee, either individually or in their *177 capacity as partners in Stater Brothers Partnership. Except to the extent financed by partner-managers, either through their leaving in the business of the markets of which they were managers portions of their shares of the market profits or by sums advanced by the partner-managers from funds received for their capital interest in another or other markets, the operations of the various markets were originally financed by funds supplied by Cleo and Leo, either individually or in their capacity as partners in Stater Brothers Partnership. As new markets of continually increasing size and offering greater profit expectations were being opened from time to time, one or more of the older inservice managers would request to withdraw from the partnership under which he was the manager of an existing market and be taken into a new partnership under which he would become manager of a new market. Changes in market managers under such circumstances were made at the request of partner-managers and were not instigated by Cleo or Leo. In most instances where such changes were made, Stater Brothers Partnership paid the partner-manager of the existing market for his capital interest in that market *178 and he in turn contributed part or all of the amount so received toward his capital interest in the new market. As to the existing market, Stater Brothers Partnership, in most instances, operated it until a new manager had established himself through a trial period when a partner-manager agreement was entered into with him as to such market. Cleo and Leo were of the opinion that the pattern of partnership agreements between Stater Brothers Partnership and market managers was the most satisfactory business form for them, in that such an arrangement created sufficient incentive on the part of the partner-managers as to relieve them (Cleo and Leo) of the responsibility of supervising the detailed operation of the markets and at the same time resulted in a greater profit being realized by them than if employed managers had been in charge of the markets. Cleo and Leo also considered that the prospects of becoming a partner-manager provided a stimulus to other personnel of the markets to perform properly their duties. Despite their satisfactory view of the foregoing aspects of market operations, Cleo and Leo were concerned about the personal liability that they, as partners in Stater *179 Brothers Partnership, were exposed to as the result of the partner-manager form of operation. This concern increased as the number and size of the markets became larger, the number of partner-manager arrangements increased, and as an increasing number of managers of comparatively limited experience were becoming partner-managers. During 1948 or 1949, Cleo consulted an attorney in San Bernardino, California, about the personal liability that he and Leo were exposed to as the result of the partner-manager form of arrangements under which the markets were being operated and discussed with the attorney the matter of forming a corporation. The attorney advised the formation of a corporation. Since Cleo and Leo had had no experience in conducting business in corporate form and were reluctant to conduct business in a form that was new to them, they took no action with respect to the attorney's advice. Early in 1950 Cleo and Leo retained a firm of attorneys in Los Angeles, California, for the purpose of estate planning and the preparation of wills for themselves and their wives. In the course of the estate planning the matter of their form of doing business was reviewed. The attorneys *180 recommended the formation of a corporation which would acquire the interest of Stater Brothers Partnership in the various market partnerships and the wholesale business then being conducted by the wholesale division of Stater Brothers Partnership and which in turn could enter into separate partnerships with the partner-managers. Cleo and Leo advised the attorneys to proceed with such a plan of incorporation. On May 6, 1950, articles of incorporation for Stater Bros., Inc., were filed. Cleo, Leo, and Leora Huggins (now known as Bessie Leora Smith) signed the articles of incorporation as the incorporators. A preliminary meeting of the incorporators was held, by-laws were adopted, and a plan of organization was outlined. Under the plan of organization the interest of Stater Brothers Partnership in each marketing partnership together with the wholesale division of Stater Brothers Partnership was to be transferred for all of the outstanding stock of Stater Bros., Inc. A permit authorizing the issuance of such stock upon the transfer of the foregoing assets was issued by the California Commissioner of Corporations on June 8, 1950, pursuant to application of Stater Bros., Inc., therefor *181 dated May 18, 1950. Following the filing of the application for a permit authorizing the issuance of stock in Stater Bros., Inc., Cleo and Leo began a reconsideration of the plan to transfer the above-mentioned assets of Stater Brothers Partnership to the corporation for stock. To them the conduct of business in corporate form seemed complicated and not readily comprehensible. They were of the opinion that the operation of the markets under the form of arrangements then in effect had been satisfactory and quite profitable. They felt, however, that the proposed plan if put into effect would hamper operations of the markets in several respects. They informed Paul Woodstra, Lavoy Stater, and Alfred Clark, the three partner-managers who had been associated with them the longest, as well as the other partner-managers of the proposed plan. Those of the partner-managers who expressed themselves about the plan expressed satisfaction with the arrangements under which they were operating and as not being desirous of any change therein. After reconsidering the matter for a month or more Cleo and Leo decided that putting the plan into effect would destroy the concept established in their minds *182 and the minds of the partner-managers that the markets represented separate business enterprises or entities and were operated as such. Accordingly they decided not to proceed with the plan. As a consequence nothing was transferred to the corporation. No stock was issued by it. No business was ever conducted by it and on February 2, 1953, it was formally dissolved by the incorporators. In 1950, 1951, and 1952, Stater Brothers Partnership entered into written agreements with the following individuals respecting the operation of the indicated retail markets wherein the form in which their operation was being conducted was designated a joint venture: Date
Individual
Market
September 19,
East River-
1950
Alfred Clark
side
September 19,
1950
Lavoy Stater
Magnolia
September 19,
West River-
1950
Lavoy Stater
side
June 5, 1951
Paul Woodstra
Fontana
June 5, 1951
Paul Woodstra
Highland
August 3, 1951
Paul Woodstra
Base Line
August 3, 1951
Alfred Clark
Second
Street
March 19, 1952
Howard Woodstra
Redlands
March 19, 1952
Raymond Woodstra
Colton
March 19, 1952
Joe Burkle
Pomona
The agreement of September 19, 1950, with Alfred *183 Clark with respect to the operation of the East Riverside market was as follows: AGREEMENT This agreement made and entered into this 19th day of Sept., 1950, by and between STATER BROS., a partnership composed of CLEO M. STATER AND LEO A. STATER, hereinafter referred to as "STATER BROS." and ALFRED B. CLARK, hereinafter referred to as "CLARK", WITNESSETH: WHEREAS STATER BROS. and CLARK are operating a market located at 2933 East Eighth Street, Riverside, California, as a joint venture, and the parties hereto have present interests in said joint venture equal to the following percentages: STATER BROS.
50%
CLARK
50% and WHEREAS the parties desire to set forth in this agreement the terms of the joint venture of the parties hereto; and WHEREAS the parties desire to provide for an orderly procedure for winding up the joint venture in the event of its termination as hereinafter provided; NOW, THEREFORE, in consideration of the premises, and the mutual promises herein contained, the parties hereto agree as follows: 1. The parties have been engaged in and shall continue as joint venturers to engage in a retail market business at 2933 East Eighth Street, *184 Riverside, California, until, by operation of law or at the will of either of the parties, such joint venture shall be terminated. 2. It is understood and agreed that "salary" may be paid to CLARK and to the partners of STATER BROS., and that true salary or other compensation may be paid to an employee of STATER BROS. as may be agreed upon from time to time. Both of said items shall be deducted before computing the net profit of the joint venture for the purposes of this agreement. Thereafter the parties hereto shall share equally in the net profits of the said joint venture and shall likewise equally share and pay the losses of said joint venture. 3. It is the intent of the parties hereto that the capital interests of each joint venturer shall be equal. If, at the date of this agreement, or at any subsequent time the interest of CLARK is less than the interest of STATER BROS. he shall allow his share of the net profits of the joint venture, as defined above, to accumulate in his account until the capital interests of the parties are equal. However, equal division of profits and sharing of losses shall not be affected by the existence of unequal capital interests in the absence *185 of agreement by the parties to the contrary. Furthermore, in the absence of agreement by the parties, neither party shall be entitled to interest on the excess of his capital investment over that of the other party. Nothing herein shall be construed to mean that a party cannot lend money to the joint venture under the terms of an interestbearing note. 4. Except to the extent that he may contribute his time and service to any other joint ventures of the parties hereto CLARK shall contribute his entire time and services to the joint venture herein described. It is contemplated that CLARK shall be in charge of the ordinary business operations of the market but that he shall take up with STATER BROS. any decisions as to policy matters, or as to joint venture matters outside of the ordinary operational details of the market and, in the case of a disagreement between the parties as to a particular policy to be followed, it is understood and agreed that the decision of STATER BROS. shall control and be followed. 5. The joint venture shall have the right to use the name "STATER BROS." in connection with its operations. The right to use this name is given to the joint venture by STATER *186 BROS. under a royalty free, non-exclusive license, during the existence of the joint venture. It is understood and agreed that in the event of the termination of the joint venture for any reason whatsoever, CLARK shall have no further right to use the name "STATER BROS." and said license shall terminate. 6. The joint venture is occupying premises under a lease or a sublease from Stater Bros. Stater Bros. either owns or has a master lease on said premises, and it is understood and agreed that the lease or sublease to the joint venture will terminate automatically in the event of the termination of the joint venture, and any and all rights of the joint venturers in and to said premises shall revert to and be vested wholly in Stater Bros. without any claim of Clark or the joint venture in or to said premises or in or to or under the terms of any lease or leases thereat or otherwise. 7. The joint venture may be terminated by either party, and such termination shall become effective at the expiration of thirty (30) days' written notice to the other party. In the event of the termination of the joint venture for any reason whatsoever other than the death of Clark so long as Leo Stater *187 or Cleo Stater is living, Stater Bros. shall have the option to purchase the interest of Clark in the joint venture for an amount equal to the agreed value of his interest in the joint venture as determined in paragraph 10 hereof as of the date of termination. Said option must be exercised within sixty (60) days after the effective date of the termination. The purchase price to be paid by Stater Bros. for Clark's interest in the joint venture, determined as aforesaid, may be paid by making a cash down payment of one-fourth (1/4) of said purchase price and by executing three (3) equal promissory notes totaling the other three-fourths (3/4) of said purchase price. Said notes shall bear interest at the rate of six percent (6%) per annum from the date of termination until paid and shall be due respectively on or before one, two, and three years from and after the date of said termination. Said promissory notes shall be secured by joint venture or other assets of a value equal to the face value of said notes. It is understood and agreed that in the event of the exercise of said option by Stater Bros. to purchase Clark's interest in the joint venture, Clark, upon delivery to him of said *188 cash down payment or the equivalent thereof and said promissory notes as hereinabove provided, shall execute such instruments as may be necessary to vest in Stater Bros. any and all right, title or interest which said Clark may have heretofore had or owned in said joint venture or any of the assets thereof, including good will, and said Clark shall agree in writing to waive any accounting or liquidation or winding up by Stater Bros. It is understood and agreed that in the event said Stater Bros. does not exercise said option, Clark shall not sell or offer for sale his said joint venture interest to any person other than Stater Bros. without first giving to Stater Bros. the right to buy said joint venture interest at the price and upon the terms said joint venture interest is offered for sale; provided, however, that such right may be exercised by said Stater Bros. only if the entire joint venture interest of said Clark is so purchased. 8. In the event of the termination of the joint venture by reason of the death of Clark, and so long as Leo Stater or Cleo Stater is living, Stater Bros. shall have the right and is obligated and agrees to purchase the interest of Clark in the joint *189 venture as of the time of such death, and agrees to assume and to pay all debts and to discharge all other obligations of the joint venture. The price which Stater Bros. shall pay for said joint venture interest shall be its agreed value as determined under the provisions of paragraph 10 hereof. Said purchase price shall be paid by making a cash down payment of one-fourth (1/4) of said purchase price and by executing three (3) equal promissory notes totaling the other three-fourths (3/4) of said purchase price. Said notes shall bear interest at the rate of six percent (6%) per annum from the date of termination until paid and shall be due respectively on or before one, two, and three years from and after the date of said termination. Said promissory notes shall be secured by joint venture or other assets of a value equal to the face value of said notes. It is understood and agreed that in such event the executor or administrator of the estate of Clark, upon delivery to him of said cash down payment or the equivalent thereof and said promissory notes as hereinabove provided, shall execute such instruments as may be necessary to vest in Stater Bros., any and all right, title or interest *190 which said Clark may have theretofore had or owned in said joint venture or any of the assets thereof, including good will, and said executor or administrator of the estate of Clark shall agree in writing to waive any accounting or liquidation or winding up by Stater Bros. 9. In the event of the deaths of both Leo Stater and Cleo Stater, upon the death of the survivor of them, Clark shall have the right and is obligated and agrees to purchase the interest of Stater Bros. in the joint venture as of the time of such death, and agrees to assume and to pay all debts and discharge all other obligations of the joint venture. The price which Clark shall pay for said joint venture interest shall be its agreed value as determined under the provisions of paragraph 10 hereof. Said purchase price shall be paid by making a cash down payment of one-fourth (1/4) of said purchase price and by executing three (3) equal promissory notes totaling the other three-fourths (3/4) of said purchase price. Said notes shall bear interest at the rate of six percent (6%) per annum from the date of termination until paid and shall be due respectively on or before one, two, and three years from and after the date *191 of said termination. Said promissory notes shall be secured by joint venture or other assets of a value equal to the face value of said notes. It is understood and agreed that, in such event, Stater Bros., upon delivery to it of said cash down payment or the equivalent thereof and said promissory notes as hereinabove provided, shall execute such instruments as may be necessary to vest in Clark any and all right, title or interest which said Stater Bros. may have theretofore had or owned in said joint venture or any of the assets thereof, including good will, and said Stater Bros. shall agree in writing to waive any accounting or liquidation or winding up by Clark. 10. In the event it becomes necessary to determine the value of a party's interest for the purposes of this agreement, it shall be determined as follows: Said value of such interest shall be the book value of the joint venturer's interest as of the date such determination becomes necessary, plus or minus that proportion of the agreed value of the good will of the joint venture which the book value of the party's interest which is being determined holds to the total book value of both partys' interests as of such time. The *192 value of said good will shall be agreed upon by the parties from time to time by executing Schedule A attached to the copy of this agreement on file in the office of the joint venture at the places indicated and setting forth thereon the date of the valuation and the amount of the valuation as of such date. For the purpose of this agreement, the last determination of value as so agreed upon shall be binding upon the parties hereto and upon their successors, assigns, administrators, and executors, and a change in said evaluation, in order to be effective, must be made in the manner outlined above. The present agreed value of said good will is zero. 11. It is understood that neither the party whose interest is being purchased, nor his or its successors in interest, shall be entitled to any of the income of the joint venture earned or accrued between the effective date of the termination of the joint venture and the date of the carrying out of the purchase and sale of the party's interest as herein provided. 12. It is contemplated that some or all of the assets of Stater Bros. may at some future date be transferred to a corporation, the majority of the stock of which shall be owned *193 by Cleo M. Stater and/or Leo A. Stater. In the event that the interest of Stater Bros. in the joint venture herein described is transferred to such a corporation, it is understood and agreed that this agreement shall continue in full force and effect, and that said corporation shall succeed to and shall assume all of the rights and obligations of Stater Bros. in and to this agreement and the joint venture herein described. 13. This agreement shall be binding upon and inure to the benefit of the heirs, administrators, executors, and assigns of Clark and the assigns and successors in interest of Stater Bros. IN WITNESS WHEREOF, the parties hereto have hereunto set their hands the day and year first above written. STATER BROS. By /s/ Cleo M. Stater / CLEO M. STATER and /s/ Leo A. Stater / LEO A. STATER /s/ Alfred B. Clark / ALFRED B. CLARK Except where the date, name of the individual involved, and name or location of the market were different all of the abovementioned written agreements were identical with the foregoing agreement with Alfred Clark. Schedule A referred to in paragraph 10 of the agreements is attached to each of the agreements and was in the following form: *194 VALUATION OF GOOD WILL
Date of Valuation
Value of Good Will
Signature of Parties
The Schedule A attached to each of the agreements is blank except those attached to the three agreements entered into with Paul Woodstra on June 5, 1951, June 5, 1951, and August 3, 1951, respecting the operation of the Fontana, Highland and Base Line markets, respectively. The Schedule A attached to each of those three agreements contains an entry showing that on the dates of the respective agreements the agreed value of the good will of each of the markets was $5,000. On August 3, 1951, a written partnership agreement was entered into between Leo and Cleo which provided, in part, as follows: PARTNERSHIP AGREEMENT THIS AGREEMENT made and entered into this 3rd day of August, 1951, by and between CLEO M. STATER and LEO A. STATER, WITNESSETH: WHEREAS, the parties hereto have been and now are partners in the business of operating retail food markets and as incidental thereto have been conducting the wholesale purchasing and distribution of food products; and WHEREAS, said parties own and operate real property on which such business activities have been carried *195 on; and WHEREAS, all of said activities have been carried on under the firm name and style of STATER BROS.; and WHEREAS, it is now the desire of the parties hereto to incorporate their agreement relating to said partnership into one document, which shall constitute the partnership agreement; and WHEREAS, the parties hereto desire to incorporate in their partnership agreement an orderly procedure for the sale on the death of either of them and for the purchase by the survivor of the deceased partner's interest in the partnership business and to avail themselves of the advantages of insuring the lives of each other for the purpose of affording the survivor the means with which to purchase the interest of the deceased partner; NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto agree as follows: 1. The parties have been engaged in and shall continue as partners to engage in the business of operating retail food markets and as an incident thereto, conducting the wholesale purchasing and distribution of food products and the owning and operating of real property on which such business activities are carried on until by *196 operation of law or by mutual agreement of the parties hereto such partnership shall be dissolved. 2. The principal office of the partnership and the principal office of said business shall be located at such place and at such other places as the partners may from time to time select. 3. The partners have made equal capital contributions to the partnership. By reason of the failure to withdraw equally the accounts of the partners are not currently equal. It is the intention, however, that the partnership account of each of the partners be equal and the failure of a partner to withdraw all or any of the share of the net profits allocated to him and the use by the partners of such funds not withdrawn shall not entitle said partner to any greater share in the profits of the partnership nor entitle said partner to receive interest from the partnership for the use of such non-withdrawn funds. It is agreed, however, that the partnership may make, execute, and deliver to either of the partners interest-bearing notes evidencing any indebtedness (whether arising out of the failure to withdraw profits or an actual advance of credit or money) which the partnership may incur to either of the *197 partners. 4. It is understood and agreed that "salaries" shall be paid to both of the partners as agreed upon by them from time to time. Said "salaries" shall be deducted before computing the net profits of the partnership business. Thereafter, the partners, as equal partners, shall share equally in the net profits of the partnership business and shall likewise equally bear and pay the losses of said partnership business. The responsibilities and duties of the partners in relation to the conduct of the business shall be as agreed upon by the partnrs from time to time. 5. Neither of the partners shall become bail or surety for any person other than his wife or child; or lend, spend, give, or make away with any of the partnership property; or draw, or accept any bill, note, or other security in the name of the partnership, except in the due course of the partnership business. 6. This agreement may be terminated by either partner, and such termination shall become effective at the expiration of thirty (30) days' written notice to the other partner. * * * Then follow provisions prescribing the procedure for a distribution of a partner's interest in the partnership in the event *198 of his withdrawal, insolvency or death. The agreement also provided as follows: 10. It is expressly understood and agreed that the partners, acting together, reserve the right at all times to alter, amend, or change this agreement in any respect. 11. This agreement shall be binding upon the heirs, administrators, executors, and assigns of the partners. The parties hereto agree for themselves and for their heirs, administrators, executors, and assigns to execute any instrument in writing which may be necessary or proper to carry out the purposes and intent of this agreement. On November 30, 1952, and November 1, 1956, written amendments to the partnership agreement respecting the procedure for the liquidation on the death of either partner of the deceased partner's interest in the partnership business were entered into by Cleo and Leo. Although upon reconsideration, Cleo and Leo had decided not to proceed with the plan formulated in 1950 for transferring the interest of Stater Brothers Partnership in each market partnership, together with the wholesale division of Stater Brothers Partnership, for all of the outstanding stock of Stater Bros., Inc., they continued to be concerned *199 about the personal liability to which they were exposed as a result of the partnermanager or joint venturer-manager form of operation and the increase in liability as the size and number of markets became larger and the number of joint venturermanagers with comparatively limited experience also increased. As a consequence they, during 1952, again discussed that matter with the firm of attorneys which they had employed in connection with their estate planning. The attorneys first suggested activating Stater Bros., Inc., formed in 1950, under the plan of organization then developed. Cleo and Leo again rejected the plan for the same reasons they had previously rejected it. The attorneys then suggested a plan of incorporation whereby a separate corporation would be formed for each market in which the joint venturer-manager would acquire 50 percent of the stock and Stater Brothers Partnership would acquire 50 percent. This plan was abandoned since several of the joint venturer-managers were without funds for that purpose. A plan was then developed under which a separate corporation would be formed with respect to each market to which would be transferred in exchange for its stock the *200 interest of Stater Brothers Partnership in each market, respectively, and the corporation would become an equal joint venturer with the joint venturer-manager thereof. Under this plan a separate corporation would be formed to acquire and conduct the business currently conducted by the wholesale division of Stater Brothers Partnership and for which the corporation would issue its stock to Stater Brothers Partnership. Cleo and Leo were of the opinion that the plan for the operation of each market by a separate corporation in a joint venture relationship with its manager would preserve their (Cleo's and Leo's) existing successful business relationship with the market managers and also would provide the desired limitation of their exposure to liability in the operation of the markets by limiting the liability of Stater Brothers Partnership to its respective interest in each market operation rather than subjecting the partnership's entire marketing operation to the liability risks of any one store. They also were of the opinion that the pattern of a separate corporation in joint venture relationship with its market manager made possible the participation by third party stockholder-investors *201 in new markets on a market-by-market basis. Cleo and Leo discussed the plan with each of the joint venture market managers and they generally were favorable to the plan. The attorneys explained to Cleo and Leo the income tax consequences of the plan and during their explanation pointed out the existence of an excess profits tax and income tax on the income of corporations and the provisions of the income tax law preventing the deduction from the income of one corporation of the losses of another corporation. Cleo and Leo adopted the plan and on November 28, 1952, articles of incorporation for the following corporations were filed with the Secretary of State of the State of California: Stater Bros., Inc.
Base Line
Stater Bros., Inc.
Colton
Stater Bros., Inc.
Magnolia
Stater Bros., Inc.
Second Street
Stater Bros., Inc.
Pomona
Stater Bros., Inc.
Redlands
Stater Bros., Inc.
East Riverside
Stater Bros., Inc.
Highland
Stater Bros., Inc.
Fontana
Stater Bros., Inc.
West Riverside
Stater Bros., Inc.
Wholesale
The form of the articles of incorporation of all of the above-named corporations filed on November 28, 1952, was substantially the same except for *202 the name of the county designated as the principal place of business and a different statement of primary business in which Stater Bros., Inc. - Wholesale intended initially to engage. The articles of incorporation of Stater Bros., Inc. - Wholesale stated that the primary business in which the corporation intended initially to engage was to operate a wholesale food distributing business whereas the articles of incorporation of the other corporations stated the primary business in which they intended initially to engage was to operate a food market as a partner. At all times pertinent herein Cleo, Leo, and Lavoy Stater were the directors of each corporation an& at all such times Cleo was president and Leo was vice president and treasurer of each corporation. The by-laws of all of the corporations were in the same form except for the name and address of the corporation and the specific times for meetings. The minutes of the first meeting of the directors were in substantially the same form, varying only in the time of meeting and description of the partnership and leasehold interests which were being acquired and the number of shares that were to be issued in exchange therefor. *203 As of December 1, 1952, the plan of incorporation was completed. The assignments of partnership and leasehold interests to the respective market corporations executed by Stater Brothers Partnership each contained a grant to the corporation named therein of a nonexclusive right to use the name of "Stater Bros." in connection with the operation of its market either alone or as a joint venturer with the proviso that Stater Brothers Partnership reserved the right to terminate such license at any time upon 30 days' written notice at which time the market corporation should cease to use such name and should cause its corporate name to be changed so that the name "Stater Bros." would not appear therein. The assignment executed to Stater Bros., Inc. - Wholesale contained a similar grant for the use of the name "Stater Bros." with the exception that Wholesale was not granted the right to use the name in the operation of its business as a joint venture. The stock of Wholesale and each of the market corporations was issued to Stater Brothers Partnership. Each joint venture market manager separately acknowledged in writing that the transfer involving the market of which he was manager had occurred *204 and that the particular corporation involving such market was thereupon a joint venturer with him subject to the existing joint venture agreement theretofore entered into between him and Stater Brothers Partnership. Stater Brothers Partnership continued in existence. Its assets after December 1, 1952, consisted of the stock in the newly formed corporations, cash not transferred to any of the corporations, certain leaseholds acquired for future markets, the Bloomington market, and the partnership's interest in the Rialto market joint venture with J. D. Huffaker. As of November 30, 1952, the Bloomington market was operating without a manager and was in the process of being sold to an unrelated third party. On November 30, 1952, Cleo and Leo contemplated that a new and larger Rialto market with a different joint venture manager would be required and that, on its completion, the existing Rialto market would be closed and the joint venture with J. D. Huffaker would be permanently terminated. A new Rialto market was built and opened for business on August 5, 1955, and the joint venture with Huffaker was terminated in 1955. Each of the newly formed market corporations established a separate *205 bank account in its own name in which was deposited its funds and the receipts from the market which was operated by it and the manager thereof as a joint venture. Such procedure was established and followed with the knowledge and approval of the respective market managers. Cleo and Leo were authorized to draw checks on such bank accounts of all the corporations. In addition, Paul Woodstra, Lavoy Stater, and Alfred Clark were authorized to draw checks on such bank accounts of the corporations with which they were joint venturers. Each of the markets was operated in the same manner following the formation of the market corporations as before their formation. In the cases of new markets or existing markets to be operated under a new joint venture, written agreements between the individual joint venture managers and the respective corporations were entered into. These written agreements contained substantially the same terms as those entered into with Stater Brothers Partnership with joint venture market managers prior to the formation of the corporations in 1952. Following the formation of the corporations in 1952, Cleo and Leo sought to substitute the corporations as lessees under *206 the outstanding leases and relieve themselves of further liability thereon. Consents to the assignment of the leases to the corporations were obtained but in no instance were Cleo and Leo relieved of their liability thereon. The Colton lease was renewed in 1955 in which Cleo and Leo were named as lessees. The Fontana lease was extended in 1955 for 10 years and was taken in the name of Stater Bros., Inc. - Fontana as lessee. In 1956 the stock of the various corporations standing in the name of Stater Brothers Partnership was distributed equally to Cleo and Leo, individually, and in 1958 the partnership finally was dissolved. The returns of the partnership for the years 1953 through 1958 showed the following items of income and expenses for the respective indicated years: 1953
1954
1955
1956
1957
1958
Income: Rialto Partnership
$13,244.08
$14,205.27
$ 9,377.44
Dividends
9,330.00
26,849.25
37,646.00
$54,256.00
Interest
1,398.96
$ 1,191.90
Rent
1,350.00
2,612.00
$ 3,000.00
3,000.00
Other
118.59
72.00
72.00
402.94
$24,091.63
$41,126.52
$48,445.44
$57,270.94
$ 3,000.00
$ 4,191.90
Expenses: Rent
$ 5,000.00
$ 6,000.00
$ 7,350.11
$ 2,100.00
$ 2,100.00
$ 2,100.00
Property Taxes
1,243.01
1,253.84
185.02
263.04
797.56
516.00
Other
68.20
143.43
216.31
99.46
73.68
$ 6,243.01
$ 7,322.04
$ 7,678.56
$ 2,579.35
$ 2,997.02
$ 2,689.68
Net Income
$17,848.62
$33,804.48
$40,766.88
$54,691.59
$ 2.98
$ 1,502.22
*207 During the period from December 1, 1952, to April 4, 1958, nine new corporations were organized and nine new markets were opened under the name of Stater Bros. as follows: Original
capitalization - cash
from sale of stock
Date of
No.
Location
Date mar-
Name of corporation
incorporation
Amount
of shares
of Market
ket opened
Stater Bros., Inc. - Hemet
4/13/53
$ 30,000
300
Hemet
11/ 1/53
Stater Bros., Inc. - Whittier
4/29/53
39,000
390
Whittier
12/11/53
Stater Bros., Inc. - Glendora
4/29/53
30,000
300
Glendora
7/ 9/54
Stater Bros., Inc. - Arlington
7/21/53
$ 30,000
300
Arlington
4/ 2/54
Stater Bros., Inc. - Rialto
10/20/54
86,000
860
Rialto
8/ 5/55
Stater Bros., Inc. - South Fontana
10/20/54
60,000
600
S. Fontana
12/12/54
Stater Bros., Inc. - North Redlands
12/19/55
57,000
570
N. Redlands
5/ 5/56
Stater Bros., Inc. - North Pomona
4/23/56
100,000
1,000
N. Pomona
10/ 5/56
Stater Bros., Inc. - Ontario
4/23/56
100,000
1,000
Ontario
3/29/57
Cleo, Leo, and Lavoy Stater were the directors of the above corporations. Cleo was President and Leo was vice president and treasurer. *208 Stock in the foregoing corporations was sold for cash to existing market corporations organized in 1952, to the older inservice managers of markets conducted as joint ventures, to key or long-time service personnel of Stater Brothers, Inc. - Wholesale, and a portion of the stock in some of the corporations to Stater Bros., Inc. - Wholesale. Requests from such market managers and from such personnel of Stater Bros., Inc. - Wholesale, sometimes hereinafter referred to as outsiders, for the privilege of investing in new corporations exceeded the requirements of the new corporations for capital funds from such sources. The dollar amount invested by outsiders in the corporations and the percentages of stock owned by them were as follows: Dollar
amount
Percentage of
Corporation
invested
stock owned
Hemet
$ 7,500
25
Whittier
9,000
23.07
Glendora
7,500
25
Arlington
7,500
25
Rialto
21,000
24.4
South Fontana
14,000
23.3
North Redlands
20,000
35
North Pomona
25,000
25
Ontario
29,000
29
Neither Cleo nor Leo nor Stater Brothers Partnership purchased stock in any of the foregoing corporations. The three outsiders, Paul Woodstra, Alfred Clark, *209 and Lavoy Stater, who purchased stock in Hemet, Whittier, Glendora, and Arlington, upon acquisition of such stock, entered into written agreements with the respective corporations and Stater Brothers partnership wherein they agreed that for a period of 10 years they would not sell, hypothecate, encumber or otherwise dispose of the stock then owned or thereafter acquired by them in the respective corporations to any person or persons except to the respective corporations and, in the event such corporations should be legally unable to purchase such stock, then to Stater Brothers Partnership. The articles of incorporation of the above-mentioned nine corporations organized during the period December 1, 1952, to April 4, 1958, provided that the business in which the corporations intended initially to engage was to operate a retail food market as a partner. Each of the nine markets was opened under similar patterns as that prevailing prior to the formation of the corporations in 1952. A lease from an outside third party was obtained in the names of Cleo and Leo containing the right to assign to a corporation controlled by them. In the case of Ontario, a lease was obtained initially in *210 the name of Stater Bros. - Ontario. The leases required construction of the building by the lessor. When construction of the market building approached the stage where plans for the installation of fixtures and stocking the market were necessary, a corporation was formed. The establishment of a joint venture for the operation of a new market followed one of two patterns. Under one pattern, one of the joint venture managers who had long experience with Cleo and Leo would become the joint venture manager in the new market, usually selling his joint venture interest in a previously existing joint venture. In such instances the joint venture manager would make a substantial contribution to the new joint venture. Under the other pattern, a new manager would be selected who would be employed by the corporation as manager for a trial period of 1 year. If such new manager proved satisfactory a joint venture agreement would be entered into with him of the same type and with the same terms as those used for all other markets. Business licenses, liquor permits, sales tax permits, and similar governmental documents requiring identification of the licensee and permittee were, prior to the formation *211 of the corporations in 1952 and at all times subsequent thereto, accurately maintained and changed from time to time to state the business entity operating under them. Upon formation of the corporations in 1952, such licenses and permits were changed to reflect the particular corporation which had been substituted as one of the joint venturers in a joint venture license or permit. When and if a corporation operated a market without a joint venture manager, the applicable licenses and permits were changed accordingly. The proceedings of the boards of directors of the various corporations were recorded in the minute books of the respective corporations and varied from corporation to corporation. During 1949, or possibly later, a revolving fund carried in the name of Stater Brothers Markets was created by the respective joint venture markets' depositing $5,000 therein. From the fund, payments were made for merchandise purchased by the respective ventures. As payments were so made for the ventures they in turn made a further deposit in the fund in the amount of the payment made, thereby maintaining their balance in the fund at a $5,000 level. A similar fund and procedure involving *212 a smaller balance was employed with respect to the payrolls of the ventures. Except for the foregoing there was no mingling of funds of the various joint ventures. Numerous loans evidenced by interest-bearing promissory notes were made by existing corporations to new corporations beginning business. In the main, the loans remained outstanding for a year or longer. Complete accounting records were maintained as to all such loans and as they were repaid the notes executed therefor were so marked and with the date of payment and check number. Partnership returns of income were filed for each joint venture in which a corporation was a party for the periods of existence of the venture, and corporation returns were filed for each corporation. The fiscal year of all corporations, except Ontario and North Pomona, ended October 31. Ontario and North Pomona were the last two corporations organized and each adopted a fiscal year ended August 31. All of the corporations organized in 1952 and all of those organized thereafter paid substantial amounts of dividends except North Redlands, Ontario, and North Pomona, the last three corporations organized, which paid none. As a result of the *213 increased number of markets, the problem of obtaining competent and experienced joint venture managers became acute by the latter part of 1957. Desirable managers were not available and the method of employing a market manager on salary on a trial basis for a year with the understanding that if he successfully managed the market during the trial period, he would be given the opportunity of becoming a joint venture manager of the market was not producing the required number of successful managers. In addition, the method resulted in a considerable portion of the time of Cleo and Leo being consumed in supervising the markets where the managers were on trial. In several of the markets two managers were employed on trial before employing a third on trial who proved to be a successful manager. In at least one market three managers in succession were employed and none of them proved to be a successful manager. The Ontario and North Pomona markets, the last two to be opened, were operating without joint venture managers. Several of the longer inservice joint venture managers were accumulating sums which they desired to invest and periodically theretofore had expressed a desire to acquire *214 an interest in Stater Bros., Inc. - Wholesale, which also was operating profitably. However, Cleo and Leo had not complied with their desire. Further, by the latter part of 1957, revenue agents had examined the books of the various corporations and the various joint ventures and questioned the propriety for income tax purposes of the arrangement under which the markets were being operated by separate joint ventures, the parties in which consisted of a corporation and the joint venture manager. In that situation Cleo and Leo considered and discussed with some of the longer inservice managers a plan whereby the older inservice managers would become supervisors under direct control of a central organization and managers of the various markets would be employees. Cleo and Leo also consulted the firm of attorneys which they had consulted in connection with the organization of the corporations in 1952 regarding the advisability of consolidating the various corporations into fewer corporate entities or into a single corporate entity. Following consultation with the firm of attorneys, Cleo and Leo further discussed the plan with other market managers and with the stockholders, heretofore *215 referred to as outsiders, in the corporations organized after 1952. Finally a plan was adopted and consummated whereby Wholesale and all the existing corporations, except five, namely, East Riverside, Second Street, Arlington, Hemet, and Glendora, would be consolidated into one corporation, the existing joint venture agreements respecting such corporations terminated, and the joint venture interests of the joint venture managers in such ventures would be transferred to the consolidated corporation for stock or if the managers desired for cash. An incentive to some joint venture managers for approving the plan was the opportunity to acquire thereby an indirect interest in Wholesale. Effective April 4, 1958, Wholesale, Stater Development Corporation, and all the market corporations organized in 1952 and subsequently, except Arlington, East Riverside, Glendora, Hemet, and Second Street, were consolidated into one corporation, Stater Bros. Markets. Each joint venture with a corporation included in the consolidation was terminated and the joint venture menager received capital stock in Stater Bros. Markets or cash if he desired in exchange for his interest in the joint venture. The *216 shareholders of the five corporations not included in the consolidation exchanged their stocks in the five corporations for stock in Stater Bros. Markets and the five corporations thereupon became wholly-owned subsidiaries of that corporation. The existing joint venture agreements relating to the five corporations remained unchanged. The five market corporations not included in the consolidation were parties to joint venture agreements with market managers who were and for some time previously had been operating successfully the markets involved in the agreements. Since it was known or reasonably believed that the services of those managers would be lost to the markets involved as well as to the consolidated corporation if the joint venture agreements were terminated, such agreements were not terminated and the existing joint venture pattern was preserved as to the operation of such markets. Following the consolidation in 1958, Cleo and Leo each owned 35.7 percent of the stock in Stater Bros. Markets. The gross sales of that corporation for the approximately 7 months' period from consolidation on April 4, 1958, to October 31, 1958, were in excess of $23,000,000 and its net income *217 for the period before income taxes was $729,256.25. The combined net income of its five subsidiary corporations for their fiscal years ended October 31, 1958, was an additional $201,858.92. As of October 31, 1958, the joint venture with Glendora corporation and the market manager was terminated and effective November 18, 1958, that corporation was merged into Stater Bros. Markets. The petitioner corporations which were organized on November 28, 1952, and those subsequently organized during the period from December 1, 1952, to April 4, 1958, were organized for substantial business purposes, engaged in substantial business activities, functioned in income-producing capacities, and constituted separate taxable entities. Further, a real and substantial business purpose prompted the organization of the petitioner corporations and their organization was not principally for the avoidance or evasion of income and excess profits taxes. Opinion Two alternative issues are presented for determination and stated in the order of priority for consideration as urged by respondent in his reply brief are the correctness of respondent's action in determining (1) that the income reported by the *218 petitioner corporations for their respective taxable years as having been derived from joint ventures with retail food market managers was includible in the income of Stater Brothers Partnership, and (2) that the respective petitioner corporations for their respective taxable years were entitled only to a fraction of one surtax exemption and, for the applicable years, only to a like fraction of one minimum excess profits credit and that in the aggregate all of the petitioner corporations were entitled to only one such exemption and, for applicable years, one such credit. In contending that his determination involved in the first of the foregoing issues should be sustained, the respondent urges that we should conclude and find that the petitioner corporations were not organized for any substantial business purpose, did not engage in any substantial business activity, did not function in income-producing capacities and lacked substance and reality; that the income reported by the corporations for their respective taxable years as having been derived from the joint ventures was in substance and in fact created, earned, and controlled by Stater Brothers Partnership which should have *219 reported it; and that in the ultimate such income was taxable to Cleo and Leo as sole members of the partnership. The petitioners insist that the respondent's contentions do not have support in the record. In substance the respondent's position is that the petitioner corporations were mere shams and their corporate entities are not to be recognized. With respect to the recognition or nonrecognition of corporate entities, the Supreme Court in , said: The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. ; Deputy v. du . * * * *220 To this rule there are recognized exceptions. , and , have been recognized as such exceptions but held to lay down no rule for tax purposes. ; Burnet v. Commonwealth Improvement Co., supra, 419, 420. * * * In general, in matters relating to the revenue, the corporate form may be disregarded where it is a sham or unreal. In such situations the form is a bald and mischievous fiction. ; . In considering the decision of the Supreme Court in the Moline Properties case, the Court of Appeals for the Second Circuit in , said: In that case the question was whether the corporation might insist upon the Treasury's including capital gains within the gross income of its sole shareholder, and the court decided that it might not. That was the same situation as existed in Burnet v. Commonwealth Improvement Co., supra 287 U.S. 415, 53 S. Ct. 198, 77 L. *221 Ed. 399. The gloss then put upon , was deliberate and is authoritative: it was that, whatever the purpose of organizing the corporation, "so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity." . That, as we understand it, is the same interpretation which was placed upon corporate reorganizations in , and which has sometimes been understood to contradict the doctrine that the motive to avoid taxation is never, as such, relevant. In fact it does not trench upon that doctrine; it merely declares that to be a separate jural person for purposes of taxation, a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation: in other words, that the term "corporation" will be interpreted to mean a corporation which does some "business" in the ordinary *222 meaning; and that escaping taxation is not "business" in the ordinary meaning. Concededly Stater Brothers Partnership owned the stock of all the corporations organized in 1952 until the stock was distributed to Cleo and Leo in 1956 and that they thereafter throughout the times material herein continued to own the stock. Concededly the corporations organized in 1952 acquired a majority of the shares of the corporations organized after December 1, 1952. From the foregoing it is apparent that Cleo and Leo, first as partners in Stater Brothers Partnership and later as stockholders in the corporations organized in 1952, were in control of all the corporations. Further, under the agreements between the various corporations and the joint venture managers, the decisions of Cleo and Leo were to control in the event of disagreement as to the policies of the various joint ventures and, under such agreements, the various corporations could terminate the joint venture agreements to which they respectively were parties and acquire the joint venture managers' interests in such ventures. Obviously, under such arrangements, ultimate control of the corporations and of the policies of the joint ventures *223 lay in Cleo and Leo who were president and vice president, respectively, of the corporations. Policy control of any successful business enterprise must rest somewhere and corporations can act only through their officers or other duly authorized persons. However, more than the control of policies was necessary for the production of income by the joint ventures. In the main, the joint venture managers were capable, experienced, and successful market managers. Their services, their capital interests in the joint ventures, and the capital interests of the corporations in such ventures also were essential factors in the production of the income of the ventures. In such a situation to find that the corporations were in fact without substance and reality and mere shams, it would be necessary for us likewise to conclude that the agreements between them and the joint venture managers also were without substance and reality and were mere shams because of the lack of at least a second party thereto. From our consideration of the record we are unable to reach any such conclusion. In our opinion the joint venture agreements were valid and subsisting agreements between the parties thereto and were *224 performed consistently with their terms. In view of the foregoing and in view of what was said in the Moline Properties and National Investors cases, it is our opinion that where as here, corporations are organized to engage in the business of operating as joint venturers with joint venture managers separate retail food markets, separately located and in most instances located in separate towns or cities, and after their organization engaged for 1 to 5 years or longer in carrying on such business, they are not to be regarded as shams but are to be regarded as separate taxable entities. Consequently we hold for the petitioners on this issue. As to the remaining issue the respondent takes the position that no real and substantial business purpose caused the organization of the petitioner corporations, that their organization was principally motivated to obtain tax benefits which otherwise would not have been enjoyed, that the principal purpose of their organization was the avoidance or evasion of income and excess profits taxes, and that his action in allocating to the respective corporations a fraction of one surtax exemption and, for the applicable years, a like fraction of one *225 minimum excess profits credit was necessary to prevent avoidance or evasion of tax. The petitioners contend that the record fully shows the circumstances and reasons underlying the organization of the corporations and establishes that the purpose for their organization was not as contended by respondent. During 1944 and at a time when it operated only four retail food markets, Stater Brothers Partnership began entering into partnership or joint venture agreements for the operation of its markets. Under these agreements the party with whom an agreement was entered into operated a particular market but made no immediate contribution to the capital employed in the operation of it. Such party, in addition to a small salary, was entitled to 50 percent of the profits resulting from the market operation but agreed to limit his withdrawals to his salary and sufficient of his share of the profits to pay the income tax thereon until his accumulated capital equaled 50 percent of the total partnership capital. Such arrangements were entered into by Stater Brothers Partnership with market managers with respect to the markets then owned by it and the markets subsequently opened or otherwise acquired. *226 By the latter part of 1952, 11 markets were being operated under such arrangements with 7 managers, 3 of whom were managers of more than one market. For accounting and administrative purposes each market was operated as a separate business entity and was so regarded by Cleo and Leo and the market managers. Cleo and Leo had been able to acquire desirable managers for all the markets. The business relations between them and the managers had been close and entirely satisfactory. The pattern of operation had not only proved successful but had proved to be profitable to both Cleo and Leo and the managers. However, as early as 1948 or 1949, Cleo and Leo had become concerned about the personal liability they were exposed to as a result of the pattern employed in the operation of the markets. Suchliability continued to be a matter of concern to them thereafter until the organization of the market corporations in 1952. In 1948 or 1949, as well as in 1950 and 1952, their attorneys proposed the formation of one corporation to acquire, among other things, the interest of Stater Brothers Partnership in each of the markets and that that corporation in turn enter into partnership or joint venture *227 agreements with the market managers. Although such an arrangement would provide a limitation on the personal liability of Cleo and Leo, it also would provide a basis for the possibility of all the market partnerships or joint ventures becoming involved in a matter originating in only one of them. In addition, Cleo and Leo were of the opinion that putting the arrangement into effect would destroy the concept in their minds and in the minds of the managers that each market was a separate business entity. Such an arrangement obviously was not acceptable to the managers since such of the managers who expressed themselves when informed of it in 1950 expressed satisfaction with the arrangements under which they were operating and were not desirous of any change therein. The plan finally proposed by the attorneys and adopted and put into effect in 1952 whereby particular corporations were organized to enter into joint venture agreements for the operation of particular markets not only limited the personal liability of Cleo and Leo to the amount invested by Stater Brothers Partnership in the stock of the particular corporations but also eliminated the possibility of all of the market joint *228 ventures being involved in a matter originating in one. In addition, the plan preserved the concept of each market being a separate business entity. In view of the foregoing it is our opinion that a real and substantial business purpose prompted the organization of the petitioner corporations and that their organization was not principally for the avoidance or evasion of income and excess profits taxes. Accordingly we sustain the petitioners as to this issue. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Stater Bros., Inc. - Second Street, Docket Nos. 82544, 86889; Stater Bros., Inc. - Hemet, Docket Nos. 78925, 82548, 86856; Stater Bros., Inc. - Arlington, Docket Nos. 78927, 82534, 86851; Stater Bros., Inc. - East Riverside, Docket Nos. 78935, 82535, 86843; Stater Bros. Markets (Successor to Stater Bros., Inc. - Redlands), Docket No. 78926; Stater Bros. Markets (Formerly Stater Bros., Inc. - Redlands), Docket Nos. 82538, 86844; Stater Bros. Markets (Successor to Stater Bros., Inc. - Highland), Docket No. 78928; Stater Bros. Markets (Formerly Stater Bros., Inc. - Highland), Docket Nos. 82552, 86892; Stater Bros. Markets (Successor to Stater Bros., Inc. - West Riverside), Docket No. 78929; Stater Bros. Markets (Formerly Stater Bros., Inc. - West Riverside), Docket Nos. 82545, 86859; Stater Bros. Markets (Successor to Stater Bros., Inc. - Colton), Docket No. 78930; Stater Bros. Markets (Formerly Stater Bros., Inc. - Colton), Docket Nos. 82550, 86888; Stater Bros. Markets (Successor to Stater Bros., Inc. - Magnolia), Docket No. 78931; Stater Bros. Markets (Formerly Stater Bros., Inc. - Magnolia), Docket Nos. 82541, 86848; Stater Bros. Markets (Successor to Stater Bros., Inc. - Pomona), Docket No. 78933; Stater Bros. Markets (Formerly Stater Bros., Inc. - Pomona), Docket Nos. 82540, 86858; Stater Bros. Markets (Successor to Stater Bros., Inc. - Base Line), Docket No. 78934; Stater Bros. Markets (Formerly Stater Bros., Inc. - Base Line), Docket Nos. 82536, 86890; Stater Bros. Markets (Successor to Stater Bros., Inc. - Fontana), Docket No. 78936; Stater Bros. Markets (Formerly Stater Bros., Inc. - Fontana), Docket Nos. 82539, 86854; Stater Bros. Markets (Successor to Stater Bros., Inc. - Glendora), Docket No. 82537; Stater Bros. Markets (Formerly Stater Bros., Inc. - Glendora), Docket No. 86850; Stater Bros. Markets (Formerly Stater Bros., Inc. - North Pomona), Docket Nos. 82542, 86857; Stater Bros. Markets (Formerly Stater Bros., Inc. - South Fontana), Docket Nos. 82546, 86891; Stater Bros. Markets (Formerly Stater Bros., Inc. - North Redlands), Docket Nos. 82549, 86853; Stater Bros. Markets (Formerly Stater Bros., Inc. - Whittier), Docket Nos. 82551, 86855; Stater Bros. Markets (Formerly Stater Bros., Inc. - Rialto), Docket Nos. 82553, 86845; Stater Bros. Markets (Formerly Stater Bros., Inc. - Ontario), Docket No. 86849; Leo A. Stater and Mary E. Stater, Docket Nos. 78924, 82547, 86847; Cleo M. Stater and Elsie R. Stater, Docket Nos. 78932, 82543, 86846; Stater Bros. (a partnership); Stater Bros., Inc. - West Riverside; Stater Bros., Inc. - Second Street; Stater Bros., Inc. - Redlands; Stater Bros., Inc. - Pomona; Stater Bros., Inc. - Magnolia; Stater Bros., Inc. - Highland; Stater Bros., Inc. - Fontana; Stater Bros., Inc. - East Riverside; Stater Bros., Inc. - Colton; Stater Bros., Inc. - Base Line; Stater Bros., Inc. - Hemet; Stater Bros., Inc. - Arlington; Stater Bros., Inc. - Glendora; Stater Bros., Inc. - Whittier, an association taxable as a corporation, Docket No. 78923; and Stater Bros., Inc. - Base Line; Stater Bros., Inc. - Highland; Stater Bros., Inc. - Fontana; Stater Bros., Inc. - Magnolia; Stater Bros., Inc. - West Riverside; Stater Bros., Inc. - Second Street; Stater Bros., Inc. - East Riverside; Stater Bros., Inc. - Redlands; Stater Bros., Inc. - Pomona; Stater Bros., Inc. - Colton; Stater Bros., Inc. - Hemet; Stater Bros., Inc. - Arlington; Stater Bros., Inc. - Glendora; Stater Bros., I nc. - Whittier; Stater Bros., Inc. - Rialto; Stater Bros., Inc. - North Redlands; Stater Bros., Inc. - South Fontana; Stater Bros., Inc. - North Pomona; Stater Bros., Inc. - Ontario; and Stater Brothers (a partnership), An Association, Taxable as a Corporation, Docket Nos. 82533, 86852.↩